## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

#### The Defendant and Related Individuals and Entities

1.      From in or around August 2015 through in or around January 2016, the Defendant Austin Smith worked on behalf of an Israel-based business named Numaris Communication ("Numaris") that provided sales and marketing services, including "retention services," for an internet-based business with the brand name BinaryBook.

2.      Numaris coordinated its work with Yukom Communications ("Yukom"), another Israel-based business that provided sales and marketing services, including "retention services," for BinaryBook and another internet-based business with the brand name BigOption.

3.      In or around August 2015, the Defendant was hired by Lee Elbaz and the owner of Numaris to work as a sales representative on behalf of BinaryBook. In or around October 2015, the Defendant was promoted to the position of Vice President of Sales at Numaris.

4.      BinaryBook and BigOption representatives sold and marketed financial instruments known as "binary options" to customers located throughout the world, including in the United States and within the District of Maryland.

5.      Lee Elbaz used the alias "Lena Green" when interacting with investors. Elbaz supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and BigOption. In addition to Yukom, Elbaz trained and supervised representatives employed by Numaris who also performed retention work on behalf of BinaryBook.

#### Background on Binary Options and Related Definitions

6.      A "binary option" was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day. The option holder was typically promised that when the binary option expired, the option holder will receive either a pre-determined amount of cash or nothing.

7.      A "conversion" representative was a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

8.     A "retention" representative was responsible for working with the investor going forward with the goal of obtaining additional deposits. As part of this effort, the Defendant and other retention representatives were responsible for educating clients on how to use the BinaryBook and BigOption platforms.

9.     A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

10.     A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

### The Defendant's Participation in the Conspiracy and Fraudulent Scheme

11.     The Defendant and other representatives of BinaryBook and BigOption, under the training and direction of Lee Elbaz and others, agreed to induce BinaryBook and BigOption investors to deposit funds based on material misrepresentations, including:

     i.     false statements and material omissions regarding the alignment of financial incentives between investors and representatives—*i.e.*, claiming to represent the interests of investors when, in fact, they were not representing the interests of investors;

     ii.     false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

     iii.     false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors;

     iv.     false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn; and

     v.     false statements and material omissions regarding—and the deceptive use of—so-called "bonuses," "risk free trades," and "insured trades."

12.     BinaryBook and BigOption representatives communicated with investors through the internet and communicated with clients by email and telephone.

13.     BinaryBook and BigOption representatives were not representing the interests of investors: When investors lost money, the owners of BinaryBook and BigOption profited.

14.     The Defendant's commissions were based on how much money his clients deposited and, after his promotion to Vice President of Sales, how much money was deposited by clients of the other sales representatives at Numaris.

15.     BinaryBook and BigOption representatives falsely referred to themselves as "analysts," "brokers," and "traders" to potential investors, when in fact they were sales

representatives. In correspondence and other communications, the Defendant identified himself as an "Expert Trader" and a "Senior Broker." The Defendant did not have a background in finance, business, or the financial markets.

16.     The Defendant used an alias—referred to internally as a "stage name"—while working on behalf of BinaryBook. The Defendant used that stage name—"John Ried"—to interact with client investors, and he also falsely presented his location and professional qualifications to client investors.  (While working at another binary options brand prior to his employment at Numaris, the Defendant used the alias "John Tillman.")

17.     For example, on or about August 27, 2015, the Defendant, on behalf of BinaryBook, sent an email to a client investor stating that his "name" was "John Ried" and that he was a "Senior Broker." Among other things, the Defendant stated:

> I currently handle about $45,000,000 in assets, my largest client has about $2,500,000 in their account. The average client that starts their account with $10,000 has a return of around $150,000. . . . My clients are profiting between 23.5% and 33% every month.

These statements were all false, and the Defendant knew that they were false at the time that he made them. Among other things, the vast majority of investors with BinaryBook lost money over time. In the same email, the Defendant also claimed that he had "worked on Wall street for 7 years and was recruited to the UK 5 years ago"—statements that were also false and that the Defendant knew to be false at the time that he made them.

18.     As another example, in or about August and September 2015, the Defendant had a series of email communications with Victim A—a resident of Gaithersburg, Maryland—who was in the District of Maryland. Those emails included a series of false statements and omissions that the Defendant knew were materially misleading at the time.

    a.     On or about August 27, 2015, the Defendant emailed Victim A regarding his contact information so that Victim A could deposit funds with BinaryBook. The Defendant used the "John Ried" alias, held himself out as an "Expert Trader," and provided a phone number with an area code associated with the United Kingdom even though the Defendant was in Israel.

    b.     The Defendant continued to exchange emails with Victim A over the course of August and September 2015—using the same misleading contact information—and claimed that he was having difficulty making money trading on Victim A's behalf. The Defendant did not disclose that he was not, in fact, representing the interests of Victim A and that both BinaryBook and the Defendant profited when Victim A lost money.

    c.     For example, on or about August 28, 2015, the Defendant sent Victim A another email with bank wire transfer instructions. Among other things, the email stated, "We are going to make an exorbitant amount of money between now and until the 17 of September." The Defendant knew that statement was false because the vast majority of investors with BinaryBook lost money and because the Defendant did not want Victim A to "make an exorbitant amount of money."

19.     The Defendant developed and implemented internal sales competitions to incentivize other BinaryBook representatives to increase the net deposits that they obtained from investors—*i.e.*, to increase the losses that investors incurred as a result of the fraudulent scheme. Sales representatives were rewarded with gift cards and other items for meeting sales goals.

20.     The Defendant also advised others at Numaris on how to recruit and retain representatives.  For example, on or about September 21, 2015, the Defendant circulated a document internally to the owner of Numaris and observed—among other things—that "[t]he people who are attracted to this line of work usually have a troubled personal history.  They were the people who cut corners and learned to manipulate at an early age."

21.     In addition, the Defendant conducted internal classes on how others at Numaris could improve "sales" and minimize withdrawals.  One tactic to prevent withdrawals—which the Defendant promoted internally—was to offer investors the use of an "Academy" session that would supposedly provide them with the skills to improve their trading performance by explaining certain market concepts to them.  In fact, the information provided in such sessions did not materially improve investors' trading performance but, rather, gave investors the false impression that they had an informational advantage that would increase their odds of success.  On or about January 12, 2016, the Defendant wrote to others at Numaris that the "Academy" was a useful promotional tool because it contrasted with the typical "high pressure sales techniques" that they used.

22.     The Defendant had direct contact with investors and induced clients to invest in binary options by falsely representing the return on investment and using "bonuses" to convince clients to continue to deposit funds.  The Defendant also attempted to prevent investors from withdrawing funds from their accounts.

23.     In furtherance of the conspiracy, the Defendant and his co-conspirators directly communicated with investors within the District of Maryland.

24.     In furtherance of the conspiracy, the Defendant was responsible for approximately $486,199 in investor losses based on his direct interactions with investors.

### The Defendant's Subsequent Concealment of His
### Involvement in the Conspiracy and Fraudulent Scheme on Behalf of BinaryBook

25.     After the Defendant's active participation in the conspiracy concluded, he used his knowledge of the binary options industry to set up a company—Wealth Recovery International—in order to obtain recoveries on behalf of victims of binary options fraud while charging a fee for his services.

26.     The Defendant obtained these recoveries by instituting or threatening litigation against and/or seeking the intervention of law enforcement agents in communications with the principals that operated various binary options brands.  In doing so, the Defendant utilized information he had obtained while working in the industry, and solicited clients of WRI based on his ability to leverage that information for their benefit.

27.     The Defendant actively promoted his business in media appearances, but he did not directly disclose to all clients of WRI—or representatives of those clients—that he had previously worked at BinaryBook and used the "John Ried" alias.

28.     On certain occasions, the Defendant obtained recoveries on behalf of BinaryBook victims and charged them commissions for their services. The Defendant did not directly disclose to all of them that he had worked at BinaryBook and used the "John Ried" alias.

29.     On at least one occasion, the Defendant engaged in this conduct and obtained approximately $125,000 in fees and commissions for the services of WRI and attorneys working with WRI from a victim—Victim B—that the Defendant had participated in defrauding while at BinaryBook.

a.      Victim B was a U.S. resident and began investing money with BinaryBook in or about November 2015. Victim B was retired, disabled, and living off a fixed income.

b.      On November 18, 2015, Victim B executed an "Insurance Policy" with BinaryBook to induce further investment from Victim B. The "Insurance Policy" was executed by Victim B, "John Tillman," and another representative of BinaryBook.

c.      Among other things, the "Insurance Policy" stated:

Binarybook agrees to insure 15% of the capital invested. The policy holder [Victim B] will also have access to the liquidity of the account, as it follows, the undersigned will be able to withdraw every 6 months 5% of the total balance of the account. As well as have access to $5,000 every month. Binarybook will cover losses that may occur as a result of any deviation or unexpected fluctuation of the market. Binarybook commits that the undersigned will have the initial investment available in the balance of the account at the end of the 24 month period and the undersigned will have an interest rate of 15% of $500,000.00.Binarybook guarantees that the policy holder will have a return of $1,800,000 at the end of the 24 month period.

d.      As part of the process of executing the agreement with Victim B, the Defendant communicated with Victim B by email, including emails from Victim B to the Defendant in which Victim B forwarded confirmation that he had wired approximately $175,000 to a bank account associated with BinaryBook.

e.      The Defendant, acting as "John Ried," also falsely claimed to be the "Executive Assistant" for a representative who had executed the "Insurance Policy" on behalf of BinaryBook.

f.      Victim B eventually deposited approximately $400,000 with BinaryBook, but he did not receive the insurance or returns promised and was initially unable to recover any of the approximately $400,000 he had deposited, despite repeated efforts he made in communications with representatives of BinaryBook.

g.      Victim B began working with WRI and counsel representing WRI in early 2017. Victim B executed an agreement that required him to pay counsel working with

13

WRI both (i) an initial $45,000 fee and, in addition, (ii) 20% of the total amount recovered on Victim B's behalf.

h.       In or about December 2017, WRI and its counsel obtained a settlement on behalf of Victim B from representatives of Yukom totaling approximately the full amount of the $400,000 that he had lost to BinaryBook. The settlement was the result, among other things, of services provided by WRI and its counsel to Victim B.

i.       Neither the Defendant—or, to his knowledge, anyone else working on behalf of WRI or its counsel—disclosed to Victim B that the Defendant had used the alias "John Ried" or that the Defendant had participated in defrauding Victim B.


SO STIPULATED:

_____
Ankush Khardori, Trial Attorney
Tracee Plowell, Assistant Chief

_____
Austin Smith
Defendant

_____
Daniel Suleiman, Esq.
Counsel for Defendant

14